# J. LEON ALEXANDER ET AL.

*vs.*

## THE CAPITAL PAINT COMPANY.

*Contract—Introduction to Purchaser—Commissions on Future Sales—Court Sitting as Jury—Declaration of Law—Common Counts.*

An express promise, in consideration of an introduction to a possible purchaser of the promisor's product, to pay commissions of a named percentage to the person giving the introduction on all sales that the manufacturer might make to such purchaser is valid, and the introduction having been given, the promisor cannot terminate his liability for such commissions without the concurrence of the person entitled thereto.

pp. 668, 669

While an ordinary brokerage contract, in regard to services to be rendered from time to time, if it names no time for its continuance, may be terminated by the employer at will, an employer cannot terminate his obligation to pay for a service already rendered under the contract of employment, although the stipulated payment consists of commissions on sales still to be made. pp. 669, 670

A contract to pay a certain commission on all business obtained from a particular company, in consideration of an introduction to one of its officers, *held* to apply to sales made to such company both from new stock and from stock on hand at the time of the contract, and both to an "order" for a single shipment and a "contract" for a number of shipments, the question whether a sales contract was a "new direct" contract or an occasional "order" being likewise immaterial. p. 670

The court, sitting as a jury, in granting defendant's prayer that if it shall find certain contracts and that they were revoked by defendant's action in notifying plaintiffs that they were terminated, or in making new contracts with its customers, plaintiff cannot recover, ruled as a matter of law that such action by defendant was sufficient to permit a finding of revocation,

and did not submit that question to be found by the court as a jury, and consequently its action in this regard is open to review even in the absence of any special objection.    p. 671

Where a case is tried without a jury, the court may and ought to be asked to decide any legal question which either party may think essential to his case.    p. 667

The function of a court sitting as a jury is to find a verdict upon the facts properly in evidence before it under the issues in the case, and in considering such facts it is bound and controlled by such instructions as it may grant concerning the legal principles involved.    p. 667

Any finding of fact by the court prior to the verdict cannot affect the right of either party to have the court rule on the legal principles involved.    p. 667

That plaintiffs, in their testimony, denied the existence of certain oral contracts in regard to compensation for their services to defendant, and claimed that their compensation was fixed by a written contract, does not preclude them from asking an instruction asserting their right of recovery in case their services are found to have been rendered under the oral contracts, the pleadings being such that the plaintiffs could have proved the oral contracts, and defendant having testified to their existence.    pp. 672, 673

Plaintiffs having fully performed the service called for by the oral contracts, they were entitled to recover the stipulated compensation under the common counts, although there was joined therewith a special count on an alleged written contract.    p. 673

*Decided June 18th, 1920.*

Appeal from the Superior Court of Baltimore City (DUFFY, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Robert R. Carman* and *James T. Carter,* with whom was
*J. Walter Lord* on the brief, for the appellants.

*William C. Coleman* and *Matthew Gault,* with whom were
*Semmes, Bowen & Semmes* on the brief, for the appellee.

OFFUTT, J., delivered the opinion of the Court.

This is an action for the recovery of commissions for the
sale of paints and pastes manufactured by the appellee. The
case was tried before the court sitting as a jury in the Su-
perior Court of Baltimore City. The verdict and judgment
thereon were in favor of the defendant and from that judg-
ment this appeal was taken.

The record contains three exceptions, two of which relate
to the court's rulings on questions of evidence and one to its
action on the prayers. The exceptions to the evidence were
not pressed in this Court, and in any event the rulings were
not injurious to the appellants and they will not be further
noticed.

The appellants sued the appellee in assumpsit on the six
common counts and one special count. In the special count
they allege that the appellee in a written contract agreed to
pay them certain commissions on all sales of paints or pastes
sold by the appellee through them, and that a large quantity
of such paints and pastes was sold through them under this
contract, but that the appellee refused to pay them the stipu-
lated commissions on such sales. The appellee pleaded the
general issue and on the issues thus made testimony was
taken by both sides and at its conclusion each side submitted
six prayers. The Court granted the plaintiffs' fifth prayer,
modified and granted their first prayer, granted the defend-
ant's first, third and fifth prayers, modified and granted its
sixth prayer, prepared and granted an instruction of its own,
and refused all the other prayers.

The correctness of these rulings depends very largely upon
the construction and effect to be given certain contracts re-

ferred to in the evidence, and involves the right of the appellants to recover upon contracts the execution of which they denied in their testimony, which differed from the contract described in their special count, and which were not specially set forth in the pleadings.

The conflicting theories of the parties to this suit concerning these questions are embodied respectively in the sixth prayer of the appellant, which was refused, and the sixth prayer of the appellee as modified and granted by the Court, and in the special exceptions thereto, and in the prayer prepared and granted by the Court.

The facts of the case so far as they are material to the consideration of these questions may be thus summarized.

The Capital Paint Company is a corporation engaged in the manufacture and sale of paints and pastes, with offices in Baltimore. The Standard Oil Company is a large consumer of pastes and oils such as manufactured by the appellee, and the appellee had been for some time prior to its relations with the appellants anxious to secure it as a customer. Up to the Spring of 1914, it had not succeeded in establishing such relations with it, but then Frank B. Shepherd, at that time sales manager and later vice-president of the Capital Paint Company, learned through a mutual acquaintance that Earle Alexander, one of the appellants, who then had offices in New York, was on friendly terms with officials of the Standard Oil Company, and that Shepherd might be able through him to secure an introduction to officials in the paint department of that company and as a result the appellee might secure it as a customer. Shortly after that Shepherd, following up this information, went to New York to meet Alexander, and through him to secure the desired introduction to persons in charge of the paint department of the Standard Oil Company.

Earle Alexander and Leon Alexander, his brother, did in fact know and were on friendly terms with officials connected

with various departments of that company. Their father had at one time been its vice-president, and Leon had for some years been actively connected with it.

Shepherd met Earle Alexander and through him or his brother was introduced to a Mr. Gilmore, the purchasing agent of the Standard Oil Company, and as a result of this introduction the appellee began to sell its products to that company and continued to sell to them from then on.

Later in much the same way the appellee's representative was introduced by Leon Alexander to L. P. Moore, vice-president of the Benjamin Moore Paint Company, whom Alexander knew very well, and as a result of this introduction appellee also secured that company as a customer.

The service rendered by the appellants in securing this business for the appellee was the introduction of the appellee's representative to the officials of the prospective buyers, and thus affording him an opportunity of explaining, to persons in a position to buy them, the merits of the appellee's product. They were not themselves familiar with the practical or technical details of the paint business, and were not expected therefore to do anything more than bring together the representatives of the appellee and persons whom they desired to interest in their product.

The testimony concerning the arrangement under which they were to be compensated for the services thus rendered is conflicting and somewhat vague. The sales to the Standard Oil Company sued on in this case began in May, 1914, while the contract sued on in this case and under which the appellants claim commissions was not executed until the following December, nor until after the last sale made to the Standard Oil Company in 1914.

That the service rendered by the appellants was valuable, and that the appellants were to be paid for it, is not to be doubted. For although Shepherd, a witness for the appellee, was inclined in his testimony to belittle and cheapen the effect of the appellants' assistance in securing the contracts

involved here, and to exaggerate the influence of his own efforts, all the testimony in the case conclusively established the fact that it was in consequence of the influence and efforts of the appellants that the appellee made its first sales to the Standard Oil Company and to the Benjamin Moore Paint Company.

The appellants claim that their right to compensation for these services was fixed by a written contract, while the appellee contends that the written contract did not relate to these services at all, but that compensation for them was fixed by two several oral contracts separate and distinct from the written contract.

In describing the circumstances surrounding the execution of the written contract, which is dated December 14th, 1914, Earle Alexander said, in reference to the sales to the Standard Oil Company, "it was finally decided the paint would be all right, and after these tests of the paint had been made it took a little while before they started to order the paint and at that time Mr. Shepherd said to us 'now that you are able to do what you thought you would be able to do we will have to have a written agreement to hold this business' we said, 'yes, that is absolutely necessary in business.'" The witness further said that after that interview, he, his brother and Shepherd went to see Mr. Symington, president of the Capital Paint Company, and discussed the rate of commissions they were to receive on the Standard Oil business, and that then the written agreement was prepared and signed.

Leon Alexander testified that he was told by his brother that Shepherd had some paint to sell, and that having "a pretty good entree" with the Standard Oil Company, he made an engagement with Mr. Gilmore of that company, and took Mr. Shepherd "down to meet him with the understanding that Mr. Shepherd would tell him about the paste or paint." The negotiations were successful, and the witness went on to say that Shepherd then told him that they would "come to some sort of terms, and we would get commissions, and that

it was understood before we went to the Standard Oil Company that we would receive a commission for introducing them and getting the customer for them, and there was never any question about our receiving commissions direct. Prices were not stipulated * * * and we had a tentative agreement until the contract was made."

The appellee admits the execution of the written contract referred to, but contends that it did not embrace the business of the Standard Oil Company, because that they had already secured before the contract was made, and it was the subject of a separate oral contract made prior to the written contract, and that it did not apply to the Benjamin Moore Paint Company business because while that was secured after the written contract was made, it too was the subject of a separate oral contract. Shepherd, who personally conducted the negotiations with the appellants, testified that the written contract was made because the appellants had to some extent familiarized themselves with the paint business and felt they could secure orders through their own efforts without any other assistance, and that the commissions stipulated in the contract were to be paid for business so secured and not for business secured through the assistance of the witness, or some other representative of the appellee. He said that when the Standard Oil business was first secured there was no definite contract for commissions, but that some time after he had been introduced to the representatives of the Standard Oil Company he voluntarily suggested to the appellants "that we did not care to be under obligations to anybody and they were so very nice to me that I thought it would be agreeable to them to recommend to the Capital Paint Company that they be paid a commission on any work or business that accrued or would be obtained from the Standard Oil Company, * * * that I knew it would be perfectly agreeable and I would take the responsibility in recommending the payment to them of a ten per cent. commission." And when asked the following, "You say you were paying ten per cent. commission

under verbal arrangement with Alexander to cover this Standard Oil business," he anwered, "Yes," and added that there was no time limit on this arrangement.

The same witness also testified that the commissions to be paid the appellants for sales made to the Benjamin Moore Paint Company were covered by the same character of contract, and the sales to that company were effected in much the same way as those made to the Standard Oil Company.

He was asked: "Was there anything said at the time or around the time of your obtaining the first order from the Benjamin Moore Company as to the commissions which might be due the Messrs. Alexander on account of that business," and he replied, "It was the same thing exactly, that I would give them the ten per cent. commission as to the Benjamin Moore Company on the material that we were selling them on the basis of the orders which we might obtain from them." He also said that the service for which these commissions were to be paid was the introduction of Shepherd to officials of these companies.

The only sales of the appellee's product effected through the instrumentality of the appellants were to these two companies. The sales to the Standard Oil Company were at first casual and occasional orders, but in 1916 the appellee secured a contract for the sale of a stated quantity of its product over a stated time. Up to that time it appears to have made use of the appellants from time to time to aid it in placing orders, and to retain the business, but with the execution of the contract with the Standard Oil Company its relations with that company were placed on a surer footing and it no longer needed the help of the appellants. They were then told they would be paid no more commissions on sales to the Standard Oil Company. Shepherd when asked if Alexander agreed to that said: "There wasn't anything else for him to do. We had compensated him sufficiently and we were through. That is all." At or about the same time the appellee also stopped paying the appellants commissions

on sales to the Benjamin Moore Company. The reason given for stopping these payments was that the sales first made to this company was of old stock and that when that was exhausted they stopped paying such commissions. Why their obligation to pay commissions ceased as soon as their old stock was exhausted does not clearly appear, for while it is said that at the time that contract was made the appellee was not running and only had old material, yet there was nothing in the contract for commissions limiting them to the sale of old material. The appellants were not notified that they would not be paid further commissions on the Benjamin Moore Company business. The appellee "just stopped" paying them.

Upon these facts the appellants contend that either under the written contract, or under the oral contracts set up by the appellee and denied by them, they are entitled to receive commissions from the appellee on all sales of its products to the Standard Oil Company or to the Benjamin Moore Company whenever made and that the appellee could not by any act in which appellants did not concur, destroy their right to such commissions or revoke the contracts. The appellee on the other hand contends that the sales were not made under the written contract but under the oral contracts but that whether made under either it had the right to revoke the appellants' employment thereunder and so terminate its right to commissions. It further contends that the appellants in their testimony having denied the oral contracts, and having sued on a separate and distinct contract cannot under the common counts recover in the same case commissions due under the oral contracts.

These questions will be taken up in the order in which they have been stated. Since the right of the appellants to receive commissions under the written or the oral contracts so long as they were in force is not questioned, the only question occurring in connection with them is whether the appellee had the power without the concurrence of the appellants

to terminate their right to receive such commissions under them. In considering this question it may be said that the findings of fact by the lower Court are not before us for review, and cannot affect the consideration of the correctness of its rulings on the prayers. "Where cases are tried before the Court without a jury, the Court may, and ought to be asked to decide any legal proposition which either party may think essential to his case." *McCullough* v. *Biedler*, 66 Md. 284; *Bond Co.* v. *Casualty Ins. Co.*, 129 Md. 194. The function of the court, sitting as a jury, is to find a verdict upon the facts properly in evidence before it under the issues in the case, and in its consideration of such facts it is bound and controlled by such instructions concerning the legal principles involved as it may grant, at the request of either party and it is the duty of the court, upon such request, to grant instructions properly stating the legal effect of the facts before it. Nor can any finding of fact by the court prior to the verdict affect the right of either party to have the court rule in this manner on the legal principles involved.

In its rulings on the prayers the learned judge who tried the case below assumed the existence of the two oral contracts, and the right of the plaintiff to recover was made to depend on their existence and effect. And in dealing with the prayers relating to them it will be assumed that there was legally sufficient evidence to establish them.

The terms and conditions of these oral contracts must be gathered from various separated statements interspersed through the testimony of the witness Shepherd. These statements furnish answers to three questions which naturally occur in the examination of such contracts. These questions and the answers thus stated are these: (1) What were the appellants required by the contract to do? To introduce the representative of the appellee to officials of the Standard Oil Company and the Benjamin Moore Company who were in a position to purchase paint for those concerns. (2) Were they to be paid for those services? Yes. (3) How? By

a ten per cent. commission on all business obtained from these companies in consequence of this introduction.

The learned court in granting the appellee's sixth prayer and in overruling the special exception thereto ruled in effect: (1) That oral contracts were made covering commissions on Standard Oil Company and Benjamin Moore Company business; (2) that the appellee had the power by so notifying the appellants to terminate their right to receive further commissions thereunder, and (3) it could terminate such right by making new "direct contracts with such companies."

In so ruling it appears to have treated the oral contracts as continuing brokerage contracts in which the term of employment was not limited. But they were not contracts of that kind, but special contracts under the terms of which the appellants undertook to render a specific ascertained service, to wit, to introduce representatives of the appellee to persons connected with the two companies referred to who could, if they would, buy its products, and for this service and this alone the appellee undertook to compensate the appellants by paying them a ten per cent. commission on all sales it might make to these companies. This compensation while it was indefinite in amount was definite and fixed in its relation to certain anticipated contingencies specified in the contracts. Whether the contract was a wise one, or the compensation excessive, are questions which are not before us for determination. It is conceded that the thing which the appellants were by its terms required to do, they fully performed, and the only question is whether the appellee could escape its obligation to pay the compensation agreed upon by merely notifying the appellants it would not pay it any longer. Unless the contract contravenes some established principle of public policy or conflicts with some constitutional provision, it is difficult to see how they could do this. There is nothing in the contract contrary to public policy, or in conflict with any constitutional prohibition. The appellee wanted the introduction, it was willing and expected to pay for it, and if

instead of paying a definite sum for something which might prove to be of no value to it, it preferred to make the compensation contingent upon success and proportioned to the benefit it might derive from it, there was no reason why it could not do so.

The appellee contends, however, that because under the literal terms of the contract the payment of the compensation provided for in it might continue as long as as it continued to sell its products to the two companies, there must be an implied right in the appellee to terminate it whenever it so willed, but the cases cited in support of its contention do not support that position. Those cases only state the recognized rule that an ordinary brokerage contract with no limitation as to the time it may continue, may be terminated at will, and relate to compensation for continuing services to be rendered from time to time. While, therefore, those cases recognize the right of the employer to terminate an indefinite employment, and so escape any obligation to pay for services to be rendered, they do not approve the proposition that an employer can by any act of his terminate his obligation to pay for services which have already been rendered under the contract, at the time he terminates it. A very definite illustration of this distinction is afforded by the written contract set out in the seventh count of the declaration. That is an ordinary brokerage contract for the employment of the appellants by the appellee for the sale of its products. It clearly contemplates that the compensation provided for in it shall only be paid as the appellee from time to time receives business through the appellants. It rests upon continuing service as well as continuing compensation therefor. And since all prior negotiation and oral agreements concerning the same subject matter were merged in the written agreement, and as it contained no provision limiting its term, there is no question but that it could have been terminated at the will of either party to it. But the oral contracts differ from the written contract in this, that whilst it relates to continuing services,

which may be stopped at any time, the oral contracts relate to a single service which has been executed, leaving open only the compensation to be paid for it, and while the appellee had the right to terminate the employment under either contract, if it did not do that before the contemplated service was rendered, it could not escape its obligation to pay the compensation it had agreed to pay for it, by simply refusing to pay it.

For the reasons stated we are of the opinion that the appellee could not release itself from its obligation to pay the compensation due under the contracts by merely notifying appellants that it would no longer pay it. We come then to the proposition that the obligation to pay commissions on sales to these two companies could be terminated if the appellee entered into "new direct contracts" with them. It appears the only oral contracts before the court, relating to the right of the appellants to receive commissions, provided, they should receive them on "any work or business that accrued to or would be obtained from the Standard Oil Company" and to "any business 'it' might obtain from the Standard Oil Company," and as to the Benjamin Moore Company business the contract was the "same thing exactly," except that at the time it was made the appellee only had on hand old stock, but there is nothing to show that that fact was embodied in the contract or disclosed to the appellants, and the testimony is uncontradicted that all the sales contracts between the appellee were direct contracts. Nor is there any distinction in principle affecting the question before the court between a contract for a single shipment called an "order" and a contract for a number of shipments referred to as a "contract." It is not apparent therefore what difference it made whether the sales contracts were "new direct" contracts or were occasional "orders," since the right of the appellants to their commissions would be the same in either case. It follows therefore that the statement in the prayer under discussion that the contracts could be revoked "by the action of the defendant in notifying plaintiffs that said verbal contracts were terminated,

or entering into new direct contracts with such companies" is not a correct statement of the law. The appellee, however, contends that even if this is true the error cannot be noticed in this Court because the question whether the contracts had been revoked in one way or the other was submitted to the court as a matter of law, and no special objection having been made to it below, such an objection cannot now be made in this Court. This criticism is not in our opinion well founded. The prayer provides that if the court shall "find that there were separate and distinct verbal contracts * * * and that both of said contracts have been revoked by the action of the defendant in notifying plaintiffs that said verbal contracts were terminated, or entering into new direct contracts with such companies" and that payment was made or tendered for sales made prior to the cancellation, the plaintiff could not recover. In granting this prayer the court ruled, as a matter of law, that the action of the appellee in notifying the appellants that the contracts were terminated or its action in making "new direct" contracts with its customers, was sufficient to permit the court to find that the appellee had revoked the contracts. It did not submit that question to be found by the court as a jury, but it stated it in the exercise of its ordinary functions as a principle of law.

The appellee's sixth prayer should have been refused for the reasons stated and also because there was no legally sufficient evidence in the case of any termination of the oral contract with the Standard Oil Company.

It was also objected that there was no evidence in the case legally sufficient to permit the court to find that the Benjamin Moore Company contract had been cancelled but, without any further recital of its details, it may be said that there is evidence in the case legally sufficient to permit that inference, not indeed that it was "cancelled," but that it automatically terminated with the exhaustion of the subject matter upon which, according to some of the testimony, it was to operate, to wit, the sale of the "old" stock of the appellee.

Coming then to the sixth prayer of the appellants, it is obvious from what has been said, that it should have been granted, if the appellants could recover in this action at all for services rendered under these oral contracts. The appellee denies that they can so recover, for the reasons, *first,* that in their testimony they denied the existence of the contracts, and *second,* because having declared on one special contract they could not recover under the common counts on a different special contract. The contention that the appellants are in some way estopped from claiming compensation under the oral contracts because they denied their existence is without force. The plaintiffs' right to recover depended upon the case made out by the evidence of both parties. They claimed that their compensation was fixed by the terms of the written contract; the appellee contended that it was fixed by the oral contracts. Both admitted that the service had been rendered. If the service was rendered under the terms of the oral contracts, the appellee is obliged to compensate the appellants therefor in the manner provided in the contract. Even though the court should find that they were mistaken in supposing that the work they did was done under the written contract, it would be both inequitable and unjust not to permit them to recover the compensation fixed in the very contract which the appellee itself proved, and if that were the only objection to the prayer it should have been granted. Nor is there anything in this position inconsistent with the decision in *Brehm* vs. *P. B. & W. R. Co.,* 114 Md. 302. That case was instituted to recover damages for the destruction of the plaintiff's horses whilst they were being driven over a railroad crossing, and in the declaration the plaintiff declared that the driver was his servant, and at the trial of the case he did not claim that the driver was not his servant, and submitted a prayer asking that the question of contributory negligence be submitted to the jury. Judge Boyd, in delivering the opinion of the Court in that case, said that the plaintiff "cannot bring the defendants into court to answer the charges thus deliber-

ately made by him, take such position as he did during the
trial, and then ask us on appeal to adopt a view wholly con-
trary to the one thus taken by him, which was not even raised
in the lower court so far as disclosed by the record." But in
this case under the pleadings the plaintiffs could have proved
the oral contracts referred to and, even though they denied
that the service for which they were to be compensated was
done under these contracts, yet if upon the whole proof the
court sitting as a jury was satisfied that the service was ren-
dered under these contracts, and further found that the plain-
tiffs had done all that they were required by these contracts to
do, then they were entitled to recover under the count for
work and labor.

The only remaining question therefore is whether the ap-
pellants could recover, under the pleadings in this case, the
compensation expressly provided in the oral contracts. The
appellants had fully performed the service they were required
under these contracts to render, the only thing which re-
mained was the payment of the stipulated compensation, and
this the appellee refused to make. Under these circumstances
the appellants were at liberty to sue under the common counts
and the measure of damages to which they would have been
entitled was the compensation stipulated in the contracts.
*City & S. Ry.* vs. *Basshor,* 82 Md. 407; *Gambrill* vs. *Schooley,*
89 Md. 549; *Appleman* vs. *Michael,* 43 Md. 282.

This question was before the court in *The Conservation
Company* v. *Stimpson,* 136 Md. 314, and in that case JUDGE
BOYD, speaking for the court, after exhaustively reviewing
the authorities dealing with it, said: "There are so many cases
in this State showing the practice and use of joining common
counts with special ones that it is unnecessary to refer to
many of them * * * In each of these cases the alleged con-
tract was verbal, like the one in this case, and the bill of
particulars is very similar to this one * * * If the common
counts are to have the effect given them in those cases when
they are not joined with a special count we can see no reason

why they should not have the same effect when they are so joined."

While the exceptions contained in the record also relate to the ruling of the court on the remaining prayers, the objections to those rulings were abandoned or at least not pressed in this court, and as it does not appear that the rulings of the court in regard to them were prejudicial to the appellants, they will not be discussed.

For the error committed in granting the appellee's sixth prayer, and in overruling the special exception based on the want of evidence legally sufficient to show the revocation of the oral contracts relating to the Standard Oil Company business, and in refusing the plaintiff's sixth prayer, the judgment appealed from must be reversed.

*Judgment reversed with costs and cause remanded for a new trial.*

STOCKBRIDGE, J., dissenting.