## AMERICAN MOTOR INNS, INC. *v.* A. W. L. ADVERTISING AGENCY, INC.

[No. 257, September Term, 1968.]

*Decided May 28, 1969.*

The cause was argued before HAMMOND, C. J., and MAR-
BURY, BARNES, MCWILLIAMS, SINGLEY and SMITH, JJ.

*Joseph S. Kaufman* for appellant.

*Leonard E. Cohen,* with whom were *Monte Fried, Frank,
Bernstein, Conaway & Goldman* on the brief for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

Both parties are unhappy; both have appealed. The dispute
arose out of a relationship claimed by the appellee (the agency)
to be a contract but which the appellant (Motor Inns) says
was nothing but a "budget allocation." The trial judge, Grady,
J., sitting without a jury, found the relationship to be a con-
tract and he awarded the agency $3,492 as damages for its
breach. His subsequent reduction of this to $2,000 is the cause
of the agency's vexation.

Motor Inns owns and operates Holiday Inn Downtown, a
Baltimore gasthof. The agency is well-known in the advertising
business. In October 1966 Motor Inns sought the services of
the agency for assistance in promoting and publicizing a new
nightclub and in the remodeling and refurbishing of other
rooms associated with the nightclub. Representatives of the
parties met eight or nine times during October to develop ideas
and plans. They discussed in detail the motif to be adopted,
the decor, the furnishings, the costumes for waitresses and

what in the trade is known as the "logo," a format of unusual design for the name of the nightclub. The agency submitted a five page proposal of ways and means of attaining the objectives of the campaign. Budget allocations for advertising were discussed and revised several times. The final revision, dated 3 November 1966 and signed by both parties, is reproduced below:

> AMERICAN MOTOR INNS, INC.
> BUDGET ALLOCATION
> Re-revised 11/3/66
> OPENING PERIOD
> (4 wks. plus 2 wks. Pre-Opening)

| | |
|---|---|
| Newspaper | $ 4,440.00 |
| Radio | 3,000.00 |
| Special Publications | 600.00 |
| Used at discretion of agency on any of the above | 800.00 |
| Total | $ 8,840.00 |

> ANNUAL BUDGET
> (Succeeding 10 months)

| | |
|---|---|
| Newspaper | $ 8,880.00 |
| Radio | 6,000.00 |
| Special Publications | 1,200.00 |
| | 1,700.00 |
| Total | $17,780.00 |

1. Plus $16\frac{2}{3}\%$ agency fee.
2. Plus $200 per month public relations fee (payable monthly).

Please sign and return this original in the space provided below, and retain two copies for your files.

> Very truly yours,
> Herbert A. Robinson /s/
> Vice President

Authorized: A. O. Krisch /s/
For: American Motor Inns, Inc.
Date: 11/3/66

The agency went to work immediately. For two or three weeks, according to the testimony, six or seven of the agency's employees spent long hours, at night, on Sundays, and on holidays, doing what was required to get a "crash program" under way. Most of the preliminary work had been finished by 17 January 1967 when the agency received a letter from Motor Inns terminating its services. No reason was given. Houck & Co. of Roanoke, Virginia was engaged by Motor Inns to continue the advertising program. The agency, at the request of Houck & Co., rendered assistance until the end of January after which it did nothing further. On 10 May 1967 the agency filed suit in the Superior Court of Baltimore City. The details of its claim are as follows:

To American Motor Inns, Inc.
 Unexpended Budget and Amount Owing Due To Cancellation

| | One Year Budget | Expended | Unexpended |
|---|---|---|---|
| Newspaper | $13,320.00 | $ 8,081.05 | $ 5,238.95 |
| Radio | 9,000.00 | 4,233.10 | 4,766.90 |
| Spec. Publ. | 1,800.00 | 2,021.00 | -221.00 |
| Agency Discretion | 2,500.00 | 2,132.83 | 367.17 |
| | $26,620.00 | $16,467.98 | $10,152.02 |
| Public Relations Fees | $2,400.00 | $600.00 | $1,800.00 |

| | Amount Owing |
|---|---|
| 16⅔% of $10,152.02 Advertising | $1,692.00 |
| 9 months Public Relations Fee | 1,800.00 |
| Total | $3,492.00 |

At trial the parties were in sharp disagreement in respect of the duration of the agency's engagement and the formula for its compensation. Herbert Robinson, the agency's vice president, testified it was to receive commissions equivalent to 16⅔% of all amounts paid to advertising media during the 11½ months and, in addition, a fee of $200 per month. Cas Applestein, the president, said his agency would not have been interested in

handling the account for less than one year. The testimony of witnesses produced by Motor Inns was, in general, to the effect that nothing was said about a definite term, that "it's against * * * [Motor Inns'] policy altogether," and that no one remembered any such discussion.

The agency produced as a witness Ernest G. Schoenback who qualified as an expert in advertising matters. He testified that in Baltimore the practice concerning written contracts between advertising agencies and their clients is subject to considerable variation. Motor Inns offered the testimony of Gilbert Sandler who also qualified as an expert witness. He said there was a difference between a contract and a budget. His agency, he continued, requires both a written contract and a budget with all of its clients. He said also that his agency requires a "non-cancellation clause" in its contract and that the period during which cancellation is precluded is a minimum of one year.

At the conclusion of the evidence Judge Grady announced, from the bench, the reasons for his decision. Excerpts therefrom are set forth below.

> "* * * It seems to me the logical way for the advertising agency to approach the situation is to find out how much money is going to be spent in a given period, agree on some percentage of that money and adjust their efforts accordingly.
>
> "Now, if the period of time over which the money is to be expended is not definite, then there isn't any yardstick at all.
>
> "It seems to me, if an agency is led to believe that there is going to be a hundred thousand dollars spent in the next year in this undertaking, then they go ahead and spend several weeks laying out a campaign, and the campaign is adopted; but at the end of the month the client says 'we are going to use your idea, we are going to make a few changes, but you are out of business, and somebody else is going to collect the other eleven months of percentage,' this, it seems to me, is beyond normal expectation and certainly, to

me, could not have been within the expectation of the parties in this case.

"I admit that this paper, which is offered as Plaintiff's Exhibit Number 2, and headed 'Budget Allocation,' leaves a lot to be desired, but it is signed by the party representing the advertising agency and by a representative of the advertiser.

"It sets forth, in my opinion, a period of time in which this money is to be spent and the compensation which the agency is to get from that expended money; and certainly the reference to public relations and advertising, newspaper, radio, and, et cetera, is certainly descriptive of the services that the agency is to render."

\* \* \*

"I find that the term is sufficiently fixed for a period of two weeks short of one year. Additionally, the percentage is set forth as is the $200 monthly fee.

"I find that the contract was an enforceable one and that no sufficient ground for its cancellation has been demonstrated."

Within the required time Motor Inns moved for a new trial or, in the alternative, a judgment n.o.v. Judge Grady, on 25 June 1968, denied the motions and in the same order reduced the judgment nisi from $3,492 to $2,000. He set forth his reasons for so doing in a "Supplement to Order" filed 31 July 1968, from which the following is quoted:

"At the time of the trial the Court's assessment of damages in the amount of $3,492 was based on the following considerations:

"Item I. The loss of income to the Plaintiff as a result of its not receiving the agency commission of 15% [sic] of the funds allocated for advertising which were in fact expended for advertising by the Defendant in accordance with the allocation; and

"Item II. The loss to the Plaintiff of $200 per month allocated as 'public relations fee.'

"With reference to Item I above, the Court found

from the evidence that the advertising motif and program conceived and produced by the Plaintiff had been continued by the Defendant without substantial changes for the balance of the term of the contract. The commissions payable to the Plaintiff as a result of the continuation of this advertising program under these circumstances would have compensated the Plaintiff for the services it had already performed without any substantial additional expenses being incurred by the Plaintiff. After hearing argument of counsel on the Defendant's Motion for a New Trial and upon reflection, the Court has concluded that this loss of income to the Plaintiff represents the only proper measure of damages.

"With reference to Item II above, the Court has determined from the evidence that the monthly fee of $200 as 'public relations fee' did not constitute compensation for services already rendered by the Plaintiff in the creation of the advertising program, but rather was a fee which the Plaintiff would have been required to earn by the rendition of continuing services. Since earning this monthly fee would have undoubtedly resulted in continuing cost to the Plaintiff, and since the Plaintiff in fact neither rendered the services nor incurred the cost thereof, the Court has concluded that Item II above was not recoverable by the Plaintiff.

"For these reasons the measure of damages was reduced in the Order of June 25, 1968, to allow compensation to the Plaintiff for Item I only."

I.

Motor Inns insists "it is clear there was no agreement between the parties as to the exact nature of the services to be rendered," and that the agency was to receive commissions only "for advertising placed." The "Budget Allocation" of 3 November 1966, it argues, was not a contract, according to the custom and usage of the business; it was simply a "guideline" which is used to indicate the amount of money an advertiser thinks he may have to spend in a stated period and which can

be revised whenever he feels the exigencies of the moment suggest a revision. And since it can be revised at any time it is terminable at will. Motor Inns views the relationship between itself and the agency as "one of agency whereby the advertising agency was employed to place certain advertisements." In its brief it has chosen to ignore the "public relations fee."

To sustain its position Motor Inns relies almost exclusively on two Missouri cases, *H. W. Kastor & Sons Adv. Co. v. Grove Laboratories, Inc.*, 58 F. Supp. 1011 (1945) and *Krupnick & Associates, Inc. v. Hellmich*, 378 S.W.2d 562 (Mo. 1964). We shall not prolong this opinion with a full discussion of them because, in our judgment, neither has any applicability to the case at bar. We think there was quite enough evidence in this record to support Judge Grady's finding that there was a contract between the parties and that "the term * * * [was] sufficiently fixed for a period of two weeks short of a year." In *Kastor* the court said:

> *"There is no evidence upon which a finding can be based that the relationship was to continue for any fixed period of time.* This Court cannot make a contract for the parties. We believe the reasonable deduction to be made from the evidence is that the relationship between plaintiff and defendant was one of agency, to continue so long as mutually satisfactory, subject to termination by either party at any time." *Id.* at 1015. (Emphasis added.)

The contract in *Krupnick* was of indefinite duration "either party * * * [being] free to cancel at any time upon 90 days" notice. The court said:

> "The appellant's action was one for breach of contract, and not in quantum meruit. See * * * [*Kastor, supra*]. Appellant's evidence showed a contract under which a *right of termination was given* and which clearly defined the rights and obligations of the parties in such event. There was no evidence to warrant the finding of an implied agreement to a different effect." *Id.* at 568.

It must not be supposed, however, that in approving Judge Grady's finding in respect of the commissions that we have rejected the notion that a budget, qua budget, may not be subject to revision during the term of a contract. In the case at bar the budget was not revised after 3 November 1966 and the testimony indicates that the amount budgeted was actually spent. It is unnecessary for us to decide, therefore, and we do not decide, whether the agency would have been entitled to commissions on the amount budgeted rather than on the amount actually spent, whether more or less than the budget. And, in the circumstances of the case before us, it makes no difference whether, after the letter of termination, the advertising was placed by Motor Inns or by some third party.

## II.

Judge Grady's reason for reducing the judgment from $3,492 to $2,000 is not entirely clear to us, unless, of course, it was, as it seems to have been, simply an inadvertence. If he intended to say what he did say in his "Supplement to Order" filed 31 July 1968, it is obvious that he intended to reduce the judgment by $1,800 which, of course, would have made the remainder $1,692 instead of $2,000. Not that it matters much because we think he should not have reduced the judgment at all. Since it is established that the term of the contract was for 11½ months it seems clear to us that the expression "plus $200 per month public relations fee (payable monthly)" contemplates a fee of $2,400 [1] to be paid to the agency in monthly installments of $200. The record is mute as to what, if any, services were to be performed in this regard, but whatever was contemplated by the parties, it is the position of the agency that substantially all work, except the placing of advertising, had been completed when Motor Inns attempted to cancel the contract on 17 January 1967 and, it might be noted, the evidence tending to support the agency's position appears not to have been controverted. In any event Motor Inns foreclosed the performance of any services not yet undertaken by the agency.

---

1. It could be argued that the correct amount would be $2,300 ($200 x 11½). Since neither party has raised the point we shall leave it at $2,400.

We see practical difficulties in trying to separate what was to be covered by the commissions from what was to be done for the fee, which lead us to the belief that the expression "public relations fee" was simply a euphemism for an additional flat charge, somewhat similar to an attorney's retainer, to be collected regardless of the amount of the commissions. Judge Grady said he had determined from the evidence that the public relations fee "did not constitute compensation for services already rendered * * * but rather was a fee which the * * * [agency] would have been required to earn by the rendition of continuing services." We think his determination was clearly erroneous, because, as we have said, the uncontroverted evidence is to the contrary. Even if this were not so we think our decisions support the recovery of the entire fee by the agency.

In *M & R Contractors & Builders, Inc. v. Michael,* 215 Md. 340 (1958), the contractor agreed to build a house for Michael for $23,420. A month or so later, after some preliminary work had been done by the contractor, Michael reneged. The contractor sued to recover the anticipated profit, $3,400. At the close of the contractor's case the trial judge, sitting without a jury, granted Michael's motion to dismiss. We reversed and remanded the case for a new trial, holding "that the damages proven [the loss of profit] are not so speculative as to be wholly non-compensatory, and further, that the trial court *must assess some damages,* nominal or substantial * * * at a retrial." Judge Horney, who delivered the opinion of the Court, went on to discuss, in depth, the "law pertaining to the measure of damages when a claim therefor is based on loss of profit." The quotation from his opinion, which follows, has relevance here :

> "With respect to minimization of damages, the ordinary rule is that damages are not recoverable if the consequences of a breach are avoidable. In other words, a plaintiff is not entitled to a judgment for damages for a loss that he could have avoided by a reasonable effort without risk of additional loss or injury. Likewise, gains that he could have made by a reasonable effort, without risk of loss or injury, by reason of opportunities he would not have had but for the other

party's breach, are deductible from the amount he is otherwise entitled to recover. *However, gains made by an injured party on other transactions after a breach should never be deducted from damages otherwise recoverable, unless such gains could not have been made had there been no breach.* 5 *Corbin, Contracts,* Secs. 1039 and 1041. On the other hand, if a plaintiff could *not* have worked on another job or project unless he had been discharged from the performance of the defendant's contract, then the gains from the other employment or undertaking must be deducted from the plaintiff's damages. Essentially, the inquiry is whether the plaintiff's employment or undertaking was of a personal nature. However, a building contractor normally has more than one project in progress at the same time. If he has, then his contracts for services to be performed are not personal. Thus, Professor Patterson, who made a detailed study of building contracts, which he set forth in his article published in 31 Colum. L. Rev., *supra* [*Builder's Measure of Recovery for Breach of Contract* (1931)], had this to say at p. 1306:

> 'The builder's gain from another contract which he took on immediately after the owner's repudiation will not be considered in reducing his recovery of full damages (including profits) for breach of contract. As an enterpriser, the builder may take on an indefinite number of contracts and make a profit on all of them.' " *Id.* at 354-55. (First emphasis added.)

It can hardly be doubted that an advertising agency, like a builder, can make its special skills available simultaneously to an indefinite number of clients and "make a profit on all of them."

In *Alexander v. Capital Paint Co.,* 136 Md. 658 (1920), the appellee had tried, without success, to sell its products to Standard Oil Company and the Moore Paint Company. Learning that Alexander was on intimate terms with officers of both companies the appellee offered him a commission of 10% of

any and all sales to both companies if Alexander would provide an introduction to officers authorized to make purchases. Appellee paid the commissions for a while and then discontinued payments. Judge Offutt, for the Court, in reversing the judgment and remanding the case for a new trial, said:

"* * * [The court below] appears to have treated the oral contracts as continuing brokerage contracts in which the term of employment was not limited. But they were not contracts of that kind, but special contracts under the terms of which the appellants undertook to render a specific ascertained service, to wit, to introduce representatives of the appellee to persons connected with the two companies referred to who could, if they would, buy its products, and for this service and this alone the appellee undertook to compensate the appellants by paying them a ten per cent. commission on all sales it might make to these companies. This compensation while it was indefinite in amount was definite and fixed in its relation to certain anticipated contingencies specified in the contracts. Whether the contract was a wise one, or the compensation excessive, are questions which are not before us for determination. It is conceded that the thing which the appellants were by its terms required to do, they fully performed, and the only question is whether the appellee could escape its obligation to pay the compensation agreed upon by merely notifying the appellants it would not pay it any longer. Unless the contract contravenes some established principle of public policy or conflicts with some constitutional provision, it is difficult to see how they could do this. There is nothing in the contract contrary to public policy, or in conflict with any constitutional prohibition. The appellee wanted the introduction, it was willing and expected to pay for it, and if instead of paying a definite sum for something which might prove to be of no value to it, it preferred to make the compensation contingent upon success and proportioned to the benefit it might de-

rive from it, there was no reason why it could not do so.

"The appellee contends, however, that because under the literal terms of the contract the payment of the compensation provided for in it might continue as long as it continued to sell its products to the two companies, there must be an implied right in the appellee to terminate it whenever it so willed, but the cases cited in support of its contention do not support that position. Those cases only state the recognized rule that an ordinary brokerage contract with no limitation as to the time it may continue, may be terminated at will, and relate to compensation for continuing services to be rendered from time to time. *While, therefore, those cases recognize the right of the employer to terminate an indefinite employment, and so escape any obligation to pay for services to be rendered, they do not approve the proposition that an employer can by any act of his terminate his obligation to pay for services which have already been rendered under the contract, at the time he terminates it."* Id. at 668-69 (Emphasis added.)

Since the agency has been paid $600 of the $2,400 public relations fee there remains to be paid only $1,800 which when added to the commissions makes the total amount due the agency to be $3,492. We shall modify the judgment entered 25 June 1968 for $2,000 and enter judgment for the agency for $3,492.

*Judgment modified by increasing the amount thereof from $2,000 to $3,492 and as modified, affirmed. Costs to be paid by the appellant.*