STUART KITCHENS, INC. *v.* STEVENS, et ux.

[No. 637, September Term, 1966.]

72

*Decided November 13, 1967.*

The cause was argued before HAMMOND, C. J., and HOR-
NEY, MARBURY, BARNES and McWILLIAMS, JJ.

*Benjamin Lipsitz* for appellant.

No brief and no appearance for the appellees.

HORNEY, J., delivered the opinion of the Court.

In this case where homeowners (Donald C. Stevens and
Gloria I. Stevens, his wife) agreed to purchase a custom kitchen
from a dealer (Stuart Kitchens, Inc.) and then refused to ac-
cept delivery of it, the alternative question is whether the dam-
ages were so speculative as to be wholly noncompensatory, or,
whether the dealer should have been allowed to recover the
profits it had lost as a result of the breach of contract.

The contract price, including the sales tax of $63.03, was
$2164.03. The homeowners were remodeling their home and
certain preliminary work had to be done before they would be
ready for delivery of the kitchen. Payment was to be made up-
on delivery which was to be made when the room in which the
kitchen was to be installed was ready. The dealer had nothing
to do with the remodeling, with the preparation of the room to
receive the kitchen or with the installation of it. All of these

things, including financing, were to be done by or arranged for by the homeowners. The only thing the dealer had to do was supply and deliver the kitchen in accordance with the specifications contained in the contract and an attached job specification sheet. It was understood that the custom items and equipment were not to be ordered by the dealer until an approximate delivery date was specified by the homeowners.

Some weeks after the execution of the contract and before delivery had been requested, the husband, stating that he did not want to go ahead with the contract and that he would not be able to accept the kitchen, sought to cancel the contract, but was told he could not do so. At the trial of the case it was shown that about a month after the contract was made the husband and wife had marital difficulties, separated and were subsequently divorced.

The only evidence concerning the cost of carrying out the contract was that given by the vice-president and salesman of the corporate dealer. He testified on direct examination that the contract price, excluding the sales tax, was $2101, that the actual cost of supplying and delivering the kitchen would have been $1405; that what the dealer suffered as a result of the breach of the contract "was the loss of not making a profit on [the] job after many hours of time which was put into it by several parties"; and that the profit would have been $696. Upon his recall, after the court expressed dissatisfaction with the proof of the cost of the materials, the witness detailed the items making up the total cost figure and also testified that he had been in the custom kitchen business for more than a decade; that he had sold approximately two thousand kitchens; that he had figured the cost and priced about thirty-five to thirty-eight hundred jobs; that he was familiar with the cost of materials; and that the prices he stated were fair and reasonable.

The lower court concluded that the contract was binding, that the homeowners breached it and that the dealer sustained damages for the loss of time spent in negotiating the contract, but found that the dealer failed to prove what it would cost to supply and deliver the kitchen with sufficient certainty to establish its loss of profits and entered a judgment for costs in favor of both appellees. The finding of fact was clearly erro-

neous. Rule 886 a. Although the record indicates that the court was familiar with the applicable rule of law, it was not applied in this case. No brief was filed on behalf of the appellees.

To recover direct profits [1] in a case such as this, the measure of damages is the difference between the contract price and what it would have cost the dealer to perform the contract had the homeowners not repudiated it. *Laporte Corp. v. Pennsylvania-Dixie Cement Corp.*, 164 Md. 642, 165 Atl. 195 (1933). In order to recover unrealized profits a plaintiff must show that the breach of the contract caused the loss; that the loss of profits was reasonably foreseeable; and that the profits were "certain." Restatement, *Contracts,* §§ 330, 331. It is as to the last requirement that the controversy arose in this case.

We think that *M & R Contractors & Builders v. Michael,* 215 Md. 340, 138 A. 2d 350 (1958), in which the recovery of unrealized profits was discussed at length, is dispositive of the questions presented by this appeal. There, it was said (at pp. 348, 349) :

> "Courts have modified the 'certainty' rule into a more flexible one of 'reasonable certainty.' In such instances, recovery may often be based on opinion evidence, in the legal sense of that term, from which liberal inferences may be drawn. Generally, proof of actual or even estimated costs is all that is required with certainty.
>
> "Some of the modifications which have been aimed at avoiding the harsh requirements of the 'certainty' rule include: (a) if the fact of damage is proven with certainty, the extent or the amount thereof may be left to reasonable inference; (b) where a defendant's wrong has caused the difficulty of proving damages, he cannot complain of the resulting uncertainty; (c) mere difficulty in ascertaining the amount of damage is not fatal; (d) mathematical precision in fixing the

---

1. Direct profits are those resulting immediately from the transaction as where a buyer defaults and the seller sues to recover lost profits as distinguished from indirect profits as where a buyer defaults and the seller seeks to recover the profit he would have made by a resale.

exact amount is not required; (e) it is sufficient if the best evidence of the damage which is available is produced; and (f) the plaintiff is entitled to recover the value of his contract as measured by the value of his profits."

In the case at bar, the lower court based its decision on its finding that the unrealized profits were uncertain because the cost of performance was not sufficiently proven. As indicated, we think otherwise. The only evidence concerning cost was the testimony of a salesman (an official of the corporate dealer) who testified in detail as to the actual cost figure. Under the circumstances, not only was this evidence (which was neither attacked nor refuted) sufficient to prove the fact of damage with reasonable certainty, but it was also reasonably inferable, since absolute preciseness was not required, that the $696 claimed as loss of profits was not improper.

> *Judgment for appellees for costs reversed; and judgment entered for appellant for $696.00, with interest from September 20, 1966; the costs, above and below, to be paid by the appellees.*