# PRESCON CORPORATION *v.* SAVOY CONSTRUC-
# TION CO., INC.

[No. 422, September Term, 1969.]

*Decided July 10, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Branko Stupar,* with whom were *Faulkner & Shands* on the brief, for appellant.

*C. Richard Beyda,* with whom was *J. Lloyd Niles* on the brief, for appellee.

FINAN, J., delivered the opinion of the Court.

Prescon Corporation, the appellant, executed a contract with Savoy Construction Co., Inc., appellee, to supply the latter with specialized structural building ma-

terials for the sum of $113,300. Appellant claims the appellee breached the contract and sued to recover losses in the amount of $46,559.[1] The lower court, sitting without a jury gave judgment for the appellant in the amount of $770, the cost of preparing shop drawings. From this judgment of the Circuit Court for Montgomery County, the appellant appeals. We are of the opinion that this case should be remanded for further proceedings pertaining to the damages sustained by the appellant, for reasons that we shall hereafter set forth. The contract dated August 4, 1967, in pertinent part provides:

> "[Prescon] Furnish all post tensioning mastic coated flat tendons as shown on structural drawings S1 through S9, as revised to 6/9/67. Tendons to be shipped wrapped with end anchorages attached, ready for placement in forms. Prescon to loan adequate stressing equipment to meet the needs of the steel placer and field supervision, both without time limitation. Furnish six copies of shop drawings within two weeks of date hereof for garage and four weeks for balance. Unloading of trucks by Savoy Construction Company, Inc. The foregoing shall be furnished for the sum of * * * Lump sum $110,000. Tax, 3%, $3,300; Total, $113,300.00."

Under the "Terms" on the face of the order is found the following:

> "One-half of one percent — 10th PROX. FOB JOB SITE OR POINT OF DELIVERY, Supplier guarantees to ship all quantities required per plans and specifications, if so stated above. Extras for additional quantities will not be honored except in case of plan change and upon written change order or proof of loss of material at job site. THIS ORDER MAY BE CAN-

---

1. $45,859 represented alleged loss of anticipated profit and $770 the cost of shop drawings.

CELLED IF (a) material is not delivered on time, (b) material is not exactly as ordered, or (c) material does not conform 'to any and all code requirements of any and all authorities having jurisdiction.' BALANCE OF ORDER MAY BE CANCELLED if after the use of a portion of the material the material fails to satisfy the purchaser. In this event the purchaser shall be obligated to pay only for the portion of material used, and only at the agreed price."

On August 8, 1967, appellant dispatched a telegram to the appellee confirming a telephone conversation between representatives of the two companies which had been held the preceding day wherein it was agreed that the appellant would cease preparation of shop drawings until notification from the appellee.

On September 1, 1967, the appellee notified the appellant by letter that it was cancelling the contract. Mr. Robert Meyer, a partner in the structural engineering firm which rendered the structural design for the Chateau Apartments, the building for which the material covered by the contract was intended, stated in his testimony that, "Our plans [for which Prescon was to supply the material] were withdrawn for the reason that the structural design appeared to the owner and the builder to be more expensive than another method proposed by another engineer."

The appellant filed a declaration in May of 1968. In the affidavit accompanying a motion for summary judgment, which was denied, it was set forth that Prescon incurred an expense of $700 in rendering shop drawings prior to the date of cancellation, that it would have cost Prescon $63,441 to have fully performed the contract and that its anticipated profit would have been $45,859.

The appellant sought to support its alleged loss of profit of $45,859, by the testimony of Mr. Ken Braselton, Vice President of Sales and Marketing of Prescon. It al-

so endeavored to introduce into evidence cost data which consisted of a series of IBM sheets and which purported to support this loss of profit. However, the evidence was not admitted on the objection of appellee's counsel. The objection was based upon the premise that, although the sheets were compiled in the usual course of business, they were duplicates of originals and further that the originals, sought to be authenticated through Braselton, had not been prepared under his supervision and direction.

The rationale followed by the lower court in limiting damages to $770, the cost of preliminary expenses and shop drawings may be gleaned from the following excerpt from its opinion:

"* * * As will be hereinafter indicated, it is extremely doubtful whether any final contract existed sufficient to warrant an award for breach of contract if damages had been sufficiently proven. An integral part of the contract was the structural drawings (S1 through S9) as revised on June 9, 1967. There was no meeting of the minds as to when work was to commence, or whether the plaintiff could ever satisfy code requirements. No plans, drawings or specifications that are referred to in this construction contract and constitute a part thereof were in evidence to show either the intention of the parties or the scope of the work, and the entire contract not being before the Court, same cannot be construed or determined. (*United Surety Co. v. Summers,* 110 Md. 95; *Staley v. New,* 250 Pac. 2nd 893 at 895; 13 Am.Jur.2nd, Par. 12 on Building Contracts).

If there is a contract, loss of expected profits is a proper damage item for breach (22 Am.Jur.2nd, Par. 174). However, this claim must fail because the evidence falls far short of showing any loss of profit with reasonable certainty sufficient to make any award except by sheer speculation. A bald statement of loss of ap-

proximately $46,559.00, unsupported by any details as to the various items which make up this figure, gives the Court nothing on which to work in arriving at a proper damage loss, if any there was. Of vital importance in a case involving orders for fabrications in building construction, is labor and materials, both of which are steadily advancing in price. Costs of interstate transportation, [etc.] * * * (Restatement Contracts, Sec. 331; *M. & R. Builders, Inc. v. Michael,* 215 Md. 340; *Evergreen Corp. v. Milstead,* 206 Md. 610; 22 Am.Jur.2nd, Par. 171, 172 & 174). While the law does not require proof of loss of profits with absolute certainty, the claimant must nevertheless prove that profits claimed were reasonably certain to have been realized. (B. & O. R. R. v. Steward, 79 Md. 487). * * *."

Aside from loss of profits, the plaintiff did testify that $700.00 was expended for shop drawings and the Court feels that this amount should be reimbursed, since this work was solicited and was sufficiently definite to be identified, and neither the cost nor the preparation of such shop drawings was contested. * * *."

We do not quarrel with the general principles of contract law set forth by the learned trial judge in his opinion. However, we disagree with his construction of the agreement before us and the manner in which those principles were applied in the case at bar.

As indicated in the quoted excerpt from the opinion, the court stressed the importance of the structural drawings and felt that their absence prevented it from construing the contract.[2] We believe this to have been a mis-

---

2. The lower court while highlighting the fact that the plans had not been introduced into evidence, made this trenchant observation towards the conclusion of the case:

"I have just indicated that the records should show that they (the plans) were available and the plaintiff attempted to introduce them and the defendant objected. They are still available as they were identified as a duplicate set

placed emphasis, as we do not place the same significance on these plans in relation to the purported breach of contract. No one disputed the existence of the plans. The appellee did not contend that any inadequacy in the plans prompted its termination of the contract. We cannot see how they play any material part in the issue as to whether or not a breach of contract occurred. It should be borne in mind that this was not *per se* a construction contract but primarily a contract to supply materials. The language of the contract sets forth the supplier's obligation. True, the plans are referred to in contract and thus incorporated in it by reference. However, as the trial judge stated during the hearing, the plans were available to the parties. Furthermore, we think the trial judge's emphasis on the necessity of introducing the plans into evidence is inconsistent with his statement to the appellee's counsel, as it appears in the record:

> "All they (Appellant) have to do to make out a prima facie case is to submit the contract, which you have conceded to, show they are ready, willing and able to perform, and they have made out their case.
>
> You have said in your opening statement that there was no work done, so the burden is on you at this time at this stage of the case."

From the facts as they appear in the record it is apparent that the contract was clear and unambiguous. The appellee did not cancel the contract because of any defect in the material to be supplied, for failure of the material to conform to Building Code requirements, for late delivery of shop plans or material, or for any reasons which on the basis of the provisions of the contract, may have supported a legitimate cancellation. Rather, it is undis-

---

of plans, the original not being in court. The only reason I mention it at all is to show that the plans were available to both parties and some emphasis was laid upon the wording 'structural drawings S-1 through S-9, as revised to June 9, 1967.' The defendant made some reference to that and I thought the record should show they were available in case anyone wanted to use them."

puted that the contract was terminated because the owner of the Chateau Apartments, for whom the appellee was constructing the building, *ex post facto* to the execution of the contract, decided to save money by adopting a less expensive structural design. Such action cannot be viewed other than as a culpable explanation for the termination of the contract.

It is undisputed that the appellant was at all times ready, able and willing to perform. The nature and purpose of the subject matter was clear, the lump sum price was expressly stated. There was no doubt regarding the consideration. The court mentions that there was no meeting of the minds as to when the work was to commence. The short answer to that is, that the appellee at the time of cancellation had already started work on the shop drawings. The contract provided that six copies of the shop drawings for the garage be furnished in two weeks from August 4, 1967, and drawings for the balance of the building in four weeks. The construction of the Chateau Apartments was imminent and since it is not refuted that the appellant was ready, able and willing to perform, it is only reasonable to assume that the parties intended that delivery of the material would follow the plans within a reasonable time for incorporation into the building. *Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 617, 112 A. 2d 901 (1955).

It is quite easy however to see the perplexing problem which faced the lower court regarding the proof of loss of profit on the part of the appellant. The appellant, as plaintiff, was wedded to the idea of offering a prima facie case as to damages and nothing more. In an effort to do this, with almost delicate precision, it compounded the difficulties facing the trial judge and came precariously close to failing to make out a case. To understand the problem thus created it is necessary to recount a pertinent segment of the trial.

The appellant's witness Braselton, its Vice President, testified that he was familiar with the contract, the plans, the material Prescon had to deliver under the contract

and the cost to the company of performing the contract. He further testified that Prescon suffered a loss of $46,-559 as a result of the wrongful termination of the contract. The appellant had a series of data sheets which had been run off from an IBM computer and which purported to support the estimated loss figure. However, since Braselton had not supervised the preparation or assembling of this data it was not allowed in evidence, even though it appeared to have been compiled in the usual course of the business of the corporation. The appellant's counsel then requested that he recall to the stand a Mr. Spamer, an employee of Prescon, who had previously testified concerning the execution of the contract. The stated purpose for recalling Spamer was to have him testify as to how he arrived at the contract bid, which figures allegedly would have reflected actual costs to the appellant. The following colloquy transpired between appellant's counsel and the court

> The Court: "For what purpose are you calling him?
>
> Counsel: "To introduce the cost estimate that's been marked as Plaintiff's Exhibit No. 5 and 5A.
>
> The Court: "In connection with the seven hundred dollars [cost of shop drawings]?
>
> Counsel: "This is in connection with the overall contract, how we arrived at the contract bid price.
>
> The Court: "No, that wouldn't be necessary. As a matter of fact, that wouldn't be helpful to the Court because this is your claim for loss of profit plus seven hundred dollars. How he arrived at his bid is not going to be helpful.
>
> Counsel: "I think the IBM runout was not admitted in evidence because of the fact that it was taken from these

original cost estimates made by Mr. Spamer. We didn't introduce the IBM runout sheets taken from Mr. Spamer's estimate and this IBM runout sheet showed in detail the cost to the company performing the contract, their damage, the loss of profit. If there is no question at this point—

The Court: "It's not a situation where there is a question or not a question, but at this stage you are concerned with a prima facie case.

I am going to hear from the defense. As I indicated before, if it is something you forgot, I will permit you to recall Mr. Spamer.

Counsel: "I can put him on later. I think we established a prima facie case on this.

The Court: "If you want to put him on, I will permit it. I am not suggesting to you how you try your case."

The record fails to reveal that Spamer was ever recalled to explain the costs or IBM data. Conceivably, the costs when deducted from the contract price would have demonstrated the profit which the appellant would have realized, but for the cancellation.

At the close of the plaintiff's case the defendant moved for a directed verdict which was overruled (technically the defendant should have made a "Motion to Dismiss," Maryland Rule 535).

The defendant then offered the testimony of Mr. Sol Bernstein, its President. He stated that the appellee had acted in good faith in terminating the contract and did so, as soon as possible, after it learned there was to be a change in the structural design of the apartment building. The testimony endeavored to establish that the ap-

pellant suffered no loss of "out of pocket money" resulting from the cancellation. However, no testimony was offered relative to the issue of the appellant's loss of profit on the contract.

The appellant, on appeal, argues that it made out a prima facie case of damages in the amount of $46,559 and that it was not required to produce further evidence in the absence of any rebuttal by the defendant.

As previously indicated, we are of the opinion that a firm and viable contract existed between the parties and that it was breached by the appellee. The right of an aggrieved party to compensation from the culpable party for damages representing the loss of profit on a contract was upheld, in an excellent opinion written for this Court by Judge Horney, in *M. & R. Contractors & Builders v. Michael,* 215 Md. 340, 138 A. 2d 350 (1958). There is no need to again repeat the conclusions reached as a result of his comprehensive review of authorities. We deem it appropriate, however, to quote from that opinion relative to the proof required to show loss of profits:

> "In such cases the loss of profits is generally measured by the difference between the contract price and the actual or estimated cost of full performance. In such instances the proof requirements are not as strict and Courts have universally held that the defendant bargaining with a businessman should necessarily foresee the prospect of the seller making a profit was the reason he entered into the contract, thus satisfying the 'foreseeability' rule." 215 Md. 346, 347.

In *M. & R. Contractors,* the Court was presented with a building contract pursuant to which the contractor had performed very little work prior to the owners' termination because of their change of mind about building a home. The Court thought the following quotation from Corbin to be helpful:

> "Profits that would have been but for the defendant's breach are frequently not to be too un-

certain or speculative for proof, when they are the profits that would have resulted immediately from the performance of the contract broken. * * *."

* * *

"It is not possible to state the precise degree of approach to certainty required for the recovery of profits as damages for breach of contract. If the mind of the Court is certain that profit would have been made if there had been no breach by the defendant, there will be a greater degree of liberality in allowing * * * a verdict for the plaintiff, even though the amount of profits prevented is scarcely subject to proof at all. In this respect, at least, doubts will generally be resolved in favor of the party who has certainly been injured and against the party committing the breach." 5 *Corbin, Contracts,* (1951) § 1022.

Unquestionably, in the case at bar, it would have been preferable to have had the appellant recall the witness Spamer to explain the costs to have been incurred by the appellant under the contract, as revealed by the IBM data sheets, rather than resting on the generalized statements of its Vice President as to the loss of profit. However, it would be unjust to affirm the lower court's holding that the appellant's "claim must fail because the evidence falls far short of showing any loss of profit with reasonable certainty sufficient to make any award except by sheer speculation." We say this because it is obvious from the present state of the record, that the court led the appellant to believe that it was an exercise in futility to proceed further with its case. By the same token, it would be unfair to hold that on the face of the record, the appellant made out a prima facie case as to damages for the loss of profit. We are of the opinion that the present posture of this case suggests the application of Maryland Rule 871, so that the case may be remanded for the purpose of presenting additional evidence, if there be such

evidence, to determine the amount of damages from loss of profits.

In arriving at the disposition of the case, we construe the judgment of the lower court in favor of the appellant for $770, to cover the cost of shop drawings, as a finding that there was a contract and that the appellee was liable for its breach. In stating this, we fully realize that, in its opinion, the lower court expressed some skepticism as to whether or not a contract actually existed between the parties. However, since we are here concerned with an action *ex contractu* at law and not an action in equity, the only theory upon which the judgment of the court may be rationalized is on the premise that it held the purchase-sales order executed by the parties to be a viable and obligatory contract, which the appellee had breached. The court then found the appellee liable for damages up to $770, because it felt that this was all the appellant had proved.

There remains one further item requiring comment. The appellee made a contrived effort to characterize the contract between the parties as a "requirements" type contract. It further contends that such a contract under § 2-615 of the Uniform Commercial Code (Code (1964 Repl. Vol.) Art. 95 B, § 2-615) may, in good faith, be discontinued by the purchaser when the "requirements" are no longer needed. The trial judge rejected this construction of the contract and we agree with that conclusion. A reading of the clear language of the contract makes it obvious that this is not a "requirements" contract. Hence there is no need to review the contract in relation to the referred section of the Uniform Commercial Code.

> *Judgment affirmed as to liability, and case remanded without affirmance or reversal for a new trial as to damages. Costs on this appeal to be paid by appellee.*