## THE MACKE COMPANY *v.* PIZZA OF GAITHERSBURG, INC. ET AL.

[No. 44, September Term, 1970.]

*Decided November 10, 1970.*

<hr>

480

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*James S. McAuliffe, Jr.,* and *William J. Rowan, III,* with whom were *Heeney, McAuliffe & McAuliffe* on the brief, for appellant.

*John C. Tracey* for appellees.

SINGLEY, J., delivered the opinion of the Court.

The appellees and defendants below, Pizza of Gaithersburg, Inc.; Pizzeria, Inc.; The Pizza Pie Corp., Inc. and Pizza Oven, Inc., four corporations under the common ownership of Sidney Ansell, Thomas S. Sherwood and Eugene Early and the same individuals as partners or proprietors (the Pizza Shops) operated at six locations in Montgomery and Prince George's Counties. The appellees had arranged to have installed in each of their locations cold drink vending machines owned by Virginia Coffee Service, Inc., and on 30 December 1966, this arrangement was formalized at five of the locations, by contracts for terms of one year, automatically renewable for a like term in the absence of 30 days' written notice. A similar contract for the sixth location, operated by Pizza of Gaithersburg, Inc., was entered into on 25 July 1967.

On 30 December 1967, Virginia's assets were purchased by The Macke Company (Macke) and the six contracts were assigned to Macke by Virginia. In January, 1968, the Pizza Shops attempted to terminate the five contracts having the December anniversary date, and in February, the contract which had the July anniversary date.

Macke brought suit in the Circuit Court for Montgomery County against each of the Pizza Shops for damages for breach of contract. From judgments for the defendants, Macke has appealed.

The lower court based the result which it reached on two grounds: first, that the Pizza Shops, when they contracted with Virginia, relied on its skill, judgment and

reputation, which made impossible a delegation of Virginia's duties to Macke; and second, that the damages claimed could not be shown with reasonable certainty. These conclusions are challenged by Macke.

In the absence of a contrary provision—and there was none here—rights and duties under an executory bilat-. eral contract may be assigned and delegated, subject to the exception that duties under a contract to provide personal services may never be delegated, nor rights be assigned under a contract where *delectus personae* was an ingredient of the bargain.[1] 4 *Corbin on Contracts* § 865 (1951) at 434; 6 Am.Jur.2d, *Assignments* § 11 (1963) at 196. *Crane Ice Cream Co. v. Terminal Freezing & Heating Co.*, 147 Md. 588, 128 A. 280 (1925) held that the right of an individual to purchase ice under a contract which by its terms reflected a knowledge of the individual's needs and reliance on his credit and responsibility could not be assigned to the corporation which purchased his business. In *Eastern Advertising Co. v. McGaw & Co.*, 89 Md. 72, 42 A. 923 (1899), our predecessors held that an advertising agency could not delegate its duties under a contract which had been entered into by an advertiser who had relied on the agency's skill, judgment and taste.

The six machines were placed on the appellees' premises under a printed "Agreement-Contract" which identified the "customer," gave its place of business, described the vending machine, and then provided:

"TERMS

"1. The Company will install on the Customer's premises the above listed equipment and will maintain the equipment in good operating order and stocked with merchandise.

"2. The location of this equipment will be such

---

1. Like all generalizations, this one is subject to an important exception. Uniform Commercial Code § 9-318 makes ineffective a term in any contract prohibiting the assignment of a contract right: *i.e.*, a right to payment. Compare Restatement, *Contracts* § 151 (c) (1932).

as to permit accessibility to persons desiring use of same. This equipment shall remain the property of the Company and shall not be moved from the location at which installed, except by the Company.

"3. For equipment requiring electricity and water, the Customer is responsible for electrical receptacle and water outlet within ten (10) feet of the equipment location. The Customer is also responsible to supply the Electrical Power and Water needed.

"4. The Customer will exercise every effort to protect this equipment from abuse or damage.

"5. The Company will be responsible for all licenses and taxes on the equipment and sale of products.

"6. This Agreement-Contract is for a term of one (1) year from the date indicated herein and will be automatically renewed for a like period, unless thirty (30) day written notice is given by either party to terminate service.

"7. Commission on monthly sales will be paid by the Company to the Customer at the following rate: * * *."

The rate provided in each of the agreements was "30% of Gross Receipts to $300.00 monthly [,] 35% over [$]300.00," except for the agreement with Pizza of Gaithersburg, Inc., which called for "40% of Gross Receipts."

We cannot regard the agreements as contracts for personal services. They were either a license or concession granted Virginia by the appellees, or a lease of a portion of the appellees' premises, with Virginia agreeing to pay a percentage of gross sales as a license or concession fee or as rent, see *Charlotte Coca-Cola Bottling Co. v. Shaw*, 232 N. C. 307, 59 S.E.2d 819 (1950) and *Herbert's Laurel-Ventura, Inc. v. Laurel Ventura Holding Corp.*, 58 Cal.App.2d 684, 138 P. 2d 43, 46-47 (1943), and were assignable by Virginia unless they imposed on Virginia du-

ties of a personal or unique character which could not be delegated, *S & L Vending Corp. v. 52 Thompkins Ave. Restaurant, Inc.,* 274 N.Y.S.2d 697, 26 App.Div.2d 935 (1966).

The appellees earnestly argue that they had dealt with Macke before and had chosen Virginia because they preferred the way it conducted its business. Specifically, they say that service was more personalized, since the president of Virginia kept the machines in working order, that commissions were paid in cash, and that Virginia permitted them to keep keys to the machines so that minor adjustments could be made when needed. Even if we assume all this to be true, the agreements with Virginia were silent as to the details of the working arrangements and contained only a provision requiring Virginia to "install * * * the above listed equipment and * * * maintain the equipment in good operating order and stocked with merchandise." We think the Supreme Court of California put the problem of personal service in proper focus a century ago when it upheld the assignment of a contract to grade a San Francisco street:

> "All painters do not paint portraits like Sir Joshua Reynolds, nor landscapes like Claude Lorraine, nor do all writers write dramas like Shakespeare or fiction like Dickens. Rare genius and extraordinary skill are not transferable, and contracts for their employment are therefore personal, and cannot be assigned. But rare genius and extraordinary skill are not indispensable to the workmanlike digging down of a sand hill or the filling up of a depression to a given level, or the construction of brick sewers with manholes and covers, and contracts for such work are not personal, and may be assigned." *Taylor v. Palmer,* 31 Cal. 240 at 247-48 (1866).

See also *Devlin v. Mayor, Aldermen and Commonalty of the City of New York,* 63 N. Y. 8, at 17 (1875). Moreover,

the difference between the service the Pizza Shops happened to be getting from Virginia and what they expected to get from Macke did not mount up to such a material change in the performance of obligations under the agreements as would justify the appellees' refusal to recognize the assignment, *Crane Ice Cream Co. v. Terminal Freezing & Heating Co., supra,* 147 Md. at 588.

In support of the proposition that the agreements were for personal services, and not assignable, the Pizza Shops rely on three Supreme Court cases, *Burck v. Taylor,* 152 U. S. 634, 14 S. Ct. 696, 38 L. Ed. 578 (1894) ; *Delaware County Comm'rs v. Diebold Safe & Lock Co.,* 133 U. S. 473, 10 S. Ct. 399, 33 L. Ed. 674 (1890) ; and *Arkansas Valley Smelting Co. v. Belden Mining Co.,* 127 U. S. 379, 8 S. Ct. 1308, 32 L. Ed. 246 (1888), all of which were cited with approval by our predecessors in *Tarr v. Veasey,* 125 Md. 199, 207, 93 A. 428 (1915). We find none of these cases persuasive. *Burck* held that the contractor for the state capitol in Texas, who was prohibited by the terms of his contract from assigning it without the state's consent, could not make a valid assignment of his right to receive three-fourths of the proceeds. In *Delaware County,* Diebold Safe and Lock, which was a subcontractor in the construction of a county jail, was barred from recovering from the county commissioners for its work on the theory that there had been a partial assignment of the construction contract by the prime contractor, which had never been assented to by the commissioners. This result must be limited to the facts: *i.e.,* to the subcontractor's right to recover under the assignment, and not to the contractor's right to delegate. See *Taylor v. Palmer* and *Devlin v. Mayor, Aldermen and Commonalty of the City of New York,* both *supra. Arkansas Valley,* which held invalid an attempt to assign a contract for the purchase of ore, is clearly distinguishable, because of a contract provision which stipulated that payment for the ore was to be made after delivery, based on an assay to be made by the individual purchaser named in the contract. The court concluded that this was a confidence im-

posed in the individual purchaser's credit and responsibility and that his rights under the contract could not be transferred to another. *Tarr v. Veasey* involved a situation where duties were delegated to one person and rights assigned to another and our predecessors held the rights not to be assignable, because of the parties' intention that duties and rights were interdependent.

We find more apposite two cases which were not cited by the parties. In *The British Waggon Co. & The Parkgate Waggon Co. v. Lea & Co.*, 5 Q.B.D. 149 (1880), Parkgate Waggon Company, a lessor of railway cars, who had agreed to keep the cars "in good and substantial repair and working order," made an assignment of the contract to British Waggon Company. When British Waggon Company sued for rent, the lessee contended that the assignment had terminated the lease. The court held that the lessee remained bound under the lease, because there was no provision making performance of the lessor's duty to keep in repair a duty personal to it or its employees.

Except for the fact that the result has been roundly criticized, see Corbin, *supra,* at 448-49, the Pizza Shops might have found some solace in the facts found in *Boston Ice Co. v. Potter*, 123 Mass. 28 (1877). There, Potter, who had dealt with the Boston Ice Company, and found its service unsatisfactory, transferred his business to Citizens' Ice Company. Later, Citizens' sold out to Boston, unbeknown to Potter, and Potter was served by Boston for a full year. When Boston attempted to collect its ice bill, the Massachusetts court sustained Potter's demurrer on the ground that there was no privity of contract, since Potter had a right to choose with whom he would deal and could not have another supplier thrust upon him. Modern authorities do not support this result, and hold that, absent provision to the contrary, a duty may be delegated, as distinguished from a right which can be assigned, and that the promisee cannot rescind, if the quality of the performance remains materially the same.

Restatement, *Contracts* § 160 (3) (1932) reads, in part:

> "Performance or offer of performance by a person delegated has the same legal effect as performance or offer of performance by the person named in the contract, unless,
>
> (a) performance by the person delegated varies or would vary materially from performance by the person named in the contract as the one to perform, and there has been no * * * assent to the delegation * * *."

In cases involving the sale of goods, the Restatement rule respecting delegation of duties has been amplified by Uniform Commercial Code § 2-210 (5), Maryland Code (1957, 1964 Repl. Vol.) Art. 95B § 2-210 (5), which permits a promisee to demand assurances from the party to whom duties have been delegated. See also, "The Uniform Commercial Code and Contract Law: Some Selected Problems," 105 U. of Pa. L.R. 837, at 913-16 (1957); *Noblett v. General Electric Credit Corp.*, 400 F. 2d 442 (10th Circ., 1968), *cert. denied* 393 U. S. 935, 89 S. Ct. 295, 21 L.Ed.2d 271 (1968).

As we see it, the delegation of duty by Virginia to Macke was entirely permissible under the terms of the agreements. In so holding, we do not put ourselves at odds with *Eastern Advertising Co. v. McGaw, supra,* 89 Md. 72, for in that case, the agreement with the agency contained a provision that "the advertising cards were to be 'subject to the approval of Eastern Advertising Company as to style and contents' ", at 82, which the court found to import that reliance was being placed on the agency's skill, judgment and taste, at 88.

Having concluded that the Pizza Shops had no right to rescind the agreements, we turn to the question of damages.

The assessment of damages for loss of profits following the breach of an executory contract has been a relatively recent development, *Prescon Corp. v. Savoy Constr.*

*Co.,* 259 Md. 52, 267 A. 2d 222 (1970) ; *American Motor Inns, Inc. v. A.W.L. Advertising Agency, Inc.,* 253 Md. 654, 254 A. 2d 191 (1969) ; *Stuart Kitchens, Inc. v. Stevens,* 248 Md. 71, 234 A. 2d 749 (1967) ; *M & R Contractors & Builders, Inc. v. Michael,* 215 Md. 340, 138 A. 2d 350 (1958) ; *Evergreen Amusement Corp. v. Milstead,* 206 Md. 610, 112 A. 2d 901 (1955) ; *J. A. Laporte Corp. v. Pennsylvania-Dixie Cement Corp.,* 164 Md. 642, 165 A. 195 (1933).

Under the concept of "foreseeability" enunciated by *Hadley v. Baxendale,* 9 Ex. 341, 156 Eng. Rep. 145 (1854), which was followed in *United States Telegraph Co. v. Gildersleve,* 29 Md. 232 (1868), in order to recover unrealized profits a plaintiff had to show that the breach of contract caused the loss and that the loss of profits was in the contemplation of the parties and the probable result of a breach. Some of the early American cases superimposed a test of certainty on the concept of foreseeability. See, for example, *Griffin v. Colver,* 16 N. Y. 489, 69 Am. Dec. 718 (1858), which was cited with approval in *United States Telegraph, supra.*

In the last hundred years, however, courts have modified the rule that anticipated profits were not an element of damages because of their inherent uncertainty, see "Speculative Profits as Damages for Breach of Contract," 46 Harv.L.Rev. 696 (1933), and have turned from the requirement of "certainty" to a more flexible test of "reasonable certainty." See Restatement, *Contracts* § 311 (1932) ; 11 *Williston on Contracts* § 1345 (3d ed. 1968) at 231 ; 5 *Corbin on Contracts* § 1020 (1964) at 124.

This Court, speaking through Judge Horney in *M & R Contractors & Builders, Inc. v. Michael, supra,* 215 Md. 340, said :

> "Courts have modified the 'certainty' rule into a more flexible one of 'reasonable certainty'. In such instances, recovery may often be based on opinion evidence, in the legal sense of that term, from which liberal inferences may be drawn.

Generally, proof of actual or even estimated costs is all that is required with certainty.

"Some of the modifications which have been aimed at avoiding the harsh requirements of the 'certainty' rule include: (a) if the fact of damage is proven with certainty, the extent or the amount thereof may be left to reasonable inference; (b) where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of the resulting uncertainty; (c) mere difficulty in ascertaining the amount of damage is not fatal; (d) mathematical precision in fixing the exact amount is not required; (e) it is sufficient if the best evidence of the damage which is available is produced; and (f) the plaintiff is entitled to recover the value of his contract as measured by the value of his profits. *McCormick, Damages,* Sec. 27 (1935)." at 348-49.

To recover direct profits in a case such as this, the measure of damages is the difference between what it would have cost Macke to perform and what it would have received had the Pizza Shops not repudiated, *M & R Contractors & Builders, Inc. v. Michael, supra,* 215 Md. at 346; *J. A. Laporte Corp. v. Pennsylvania-Dixie Cement Corp., supra,* 164 Md. at 648.

We can understand why the court below was "not satisfied that the claim for damages [was] shown with reasonable certainty, since it [was] based upon conjecture." Macke attempted to prove damages by the testimony of two witnesses. The first was Arnold Harlem, the general manager of Macke's Chesapeake area, in which the Pizza Shops were located. His testimony related to gross sales figures for the cold drink vending machines at the six locations for the month of January, 1968, when the machines were still under Macke's control. He produced a computer print-out (which was not introduced in evidence) in support of his statement that Macke's cost of

goods for January 1968 was 23.62% of gross sales. From this testimony, it might have been possible to extrapolate what Macke's profit would have been on five of the machines for the 11 months commencing 1 February 1968 and ending 31 December 1968 and on one of the machines for the period February 1968 to 24 July 1968 when the Virginia agreements respectively ended, assuming that cold drink sales in the Pizza Shops remained uniform during the year, as Mr. Harlem said they did, and that cost of goods did not vary.

No such extrapolation was introduced in evidence, but one had been supplied in answer to an interrogatory. For some unaccountable reason, it projected sales and profits for 10 months only, included the Gaithersburg location for five months, which, for reasons to be developed, should not have been included at all, and failed to reflect that five of the agreements provided for an increase in commission rates from 30% to 35% on gross receipts in excess of $300 in any month.

Macke then called Thomas S. Sherwood, one of the individual defendants, as an adverse witness. He testified, without objection, to the commissions received by five of the Pizza Shops during the calendar year 1967, and by the sixth shop, at Gaithersburg, for the last five months of that year. Based on this testimony, Macke's counsel prepared, and submitted to the court, a "Memorandum of Damages Claimed," an extrapolation of 1967 figures intended to show profits lost in 1968.

The fact that the projection from Harlem's testimony showed lost profits of $5,286.80,[2] and the extrapolation from Sherwood's testimony showed lost profits of $9,047.00[3] was surely enough to give the lower court pause. Factually, the situation was not dissimilar from that in *Prescon Corp. v. Savoy Constr. Co., supra,* 259 Md. 52, at 55, where the plaintiff attempted to establish a prima facie case of lost profits by having its vice president testify from a computer print-out which was never intro-

2. The correct total should have been $5,386.80.
3. This figure included Gaithersburg for *seven* months.

duced in evidence. The opinion in *Prescon,* delivered more than six months after the trial of the case before us, was, of course, not available to the trial court. In *Prescon,* we affirmed the judgment as to liability, but remanded the case so that additional evidence could be taken on the question of damages.

There is ample authority for the proposition that loss of profits may be projected from past performance, *Tucson Federal Savings & Loan Ass'n v. Aetna Investment Corp.,* 74 Ariz. 163, 245 P. 2d 423 (1952) ; *Kay Petroleum Corp. v. Piergrossi,* 137 Conn. 620, 79 A. 2d 829 (1951) ; *Eastman Kodak Co. of New York v. Southern Photo Materials Co.,* 273 U. S. 359, 47 S. Ct. 400, 71 L. Ed. 684 (1927), assuming, of course, that past performance has continued long enough to be the best evidence of damage which is available, *Eastman Kodak Co. of New York v. Southern Photo Materials Co., supra.*

We cannot agree with the lower court's conclusion that the claim for damages could not be shown with reasonable certainty because it was based on conjecture. For this reason, we propose to remand the case in order that damages may properly be assessed. On remand, the court may wish to take several factors into consideration. First, it seems clear to us that no damages should be allowed with respect to the repudiation of the agreement covering the vending machine at 16523 North Frederick Road, Gaithersburg. The uncontroverted testimony of the Pizza Shop's manager established that the agreement covering this machine was breached in January, 1968 by Macke's failure to stock and service the machine.

Then, too, the record is deficient as regards Macke's duty to mitigate damages. Harlem's testimony as to what disposition was made of the vending machines removed from the Pizza Shops was vague and inconclusive. It may well be that the machines were placed at other locations prior to the time when the agreements would have expired by their terms, and this, of course, may have to be taken into account in assessing damages, subject, however, to the limitation that gains made by Macke could

not have been made, save for the breach. *M & R Contractors & Builders, Inc. v. Michael, supra,* 215 Md. at 355; 5 Corbin, *supra* §§ 1039, 1041 at 241, 256; McCormick, *Handbook on the Law of Damages,* § 41 (1935) at 151.

Finally, it is not an implausible inference that Macke's machines were replaced in the Pizza Shops by comparable machines provided by another concern. If this is the case, a more appropriate measure of damages might be that grounded on the five Pizza Shops' actual experience for the period February through December 1968, rather than one based on extrapolating profits from the results experienced in the year 1967 or in January 1968, particularly in the light of testimony that the seating capacity of one or more of the shops may have been altered in 1967 and the conflicting testimony as to whether cold drink sales remain constant in pizza shops. Authority for the use of a defendant's future earnings as an appropriate method of determining lost profits may be found in *Pace Corp. v. Jackson,* 155 Tex. 179, 284 S.W.2d 340 (1955); *Sinclair Refining Co. v. Jenkins Petroleum Process Co.,* 289 U. S. 689, 53 S. Ct. 736, 77 L. Ed. 1449 (1933).

The appellees make two other points which can be summarily disposed of. The first is that the agreements were terminable at any time on 30 days' notice. A careful examination of the agreements shows that this was simply not the case, despite the fact that the president of Virginia and the Pizza Shops may have thought so. The second point is that the assignments were invalidated by Virginia's failure to comply with the provisions of the U.C.C. relating to bulk transfers, Code Art. 95B, Subtitle 6. The short answer to this is that the Pizza Shops were not creditors in the context of their relationships with Virginia, since they had control of the machines and were accountable to Virginia for their contents. Additionally, see U.C.C. § 6-102 (3) and Official Comment to this subsection, indicating that the primary thrust of the bulk transfer provisions of the U.C.C. is directed at en-

terprises whose principal business is the sale of merchandise from stock.

*Judgment reversed as to liability; judgment entered for appellant for costs, on appeal and below; case remanded for a new trial on the question of damages.*