## REIGHARD *v.* DOWNS D/B/A Harford Survey Associates ET AL.

[No. 239, September Term, 1970.]

*Decided February 9, 1971.*

*Motions for rehearing and clarification filed March 11, 1971; rehearing denied and opinion modified April 5, 1971.*

---

The cause was argued before HAMMOND, C. J., and BARNES, SINGLEY, SMITH and DIGGES, JJ.

*Nelson R. Kerr, Jr.*, with whom were *Barbara K. Howe* and *Kerr & Kerr* on the brief, for appellant.

*Charles H. Reed, Jr.*, with whom were *Stanley Getz, Cameron & Reed* and *Getz, Getz & Getz* on the brief, for appellees.

SMITH, J., delivered the opinion of the Court.

It is claimed that a transposition of figures created this litigation. Appellant Lanious K. Reighard (Reighard) sued appellees Leo Clark Downs (Downs), doing business as Harford Survey Associates, and Earl Bradley Crabtree (Crabtree), Downs' employee, when it developed that a tract of land Reighard purchased in Harford County contained two and a half acres less than a plat had shown. We shall reverse judgment entered in favor of the defendants and remand the case for determination of appellant's damages.

Reighard is a Harford County real estate broker. Prior to 1965, Gary B. Scheeler and other members of his family were owners of a large tract of land in Harford County with a frontage on Old Joppa Road. Some of this land was sold through Reighard and a realtor by whom he was then employed as sales manager. When the Scheelers decided

to sell 14 acres of land behind that which Reighard had sold, they listed with the realtor. Additional land was added. Through Reighard, Downs, a registered land surveyor, was employed to survey this tract. Various drawings were submitted. Ultimately plats were submitted specifying the acreage of the "enclosed area" to be "22.-075 Ac. ±".

Reighard began to be interested in purchasing the land himself. The Scheeler listing was at $33,000.00 which worked out to about $1,500.00 per acre. Reighard offered $27,500.00, which he said was $1,250.00 per acre. An oral agreement was ultimately reached in April on this basis, with the Scheelers to get the sod off the meadow land. The sale was then contingent upon Reighard's obtaining a satisfactory subdivision plan and establishing that the land would pass percolation tests.

Between the time that Reighard and the Scheelers orally agreed on a sale and the execution on June 21, 1966, of a contract of sale, Downs was directed by Reighard to do yet additional work relative to this land for which Reighard paid. Reighard testified that he advised Crabtree (stipulated to have been an employee of Downs) that he wanted lots of approximately one acre in size with a minimum frontage of 125 feet. Many additional plans were submitted. The June 3 plat showed 19 lots; the July 8 plat, 20 lots; the August 9 plat, 17 lots; and the September 27 plat, 17 lots. Settlement was made on August 15, 1966.

When Downs was requested to compute the size of each of the then remaining 17 lots and the area included in the roadbed it was discovered that the area enclosed on the plats (and purchased by Reighard) comprised 19.58 acres rather than 22.075 acres. There was no contention of error in the laying down of the lines. The error was one of computation brought about by inverting two coordinates when they were fed into a calculating machine by Crabtree.

Reighard sued Scheeler, Downs and Crabtree. The

trial court sustained without leave to amend a demurrer filed on behalf of the Scheelers. There is no appeal here upon that point.

The trial judge stated in pertinent part:

"The Defendants' position is that the Plaintiff has failed to show a breach of any legal duty owed by them to the Plaintiff, so, therefore, there is no breach of contract. The Declaration says the Defendants did not perform the work in a 'good and workmanlike manner'. While this wording may sound in tort, the Counts of the Declaration sound in contract, and, therefore, the Court will regard this case as one of a breach of contract. Since the Defendants also allege that a fatal variance exists by reason of the failure of proof to match the allegations, the Court must also review the evidence in connection with the allegations.

"Counts 4, 5 and 8 as Amended are the only remaining Counts in the Declaration that are relevant to the issue at hand. Counts 4 and 8 allege an Agreement between the Plaintiff and the Defendants that calls for the Defendants to prepare a satisfactory Sub-division Plan. The Defendants prepared a Plan calling for 23 lots, but the Plaintiff felt it was too crowded and, therefore, unsatisfactory. He asked for another Plan and an explanation of why 23 lots could not be fitted in. Another Plan was submitted calling for 20 lots. This appeared to be satisfactory and was submitted to Harford County for approval as a Sub-division. The Plan was disapproved because a change in the road plans and the drainage was requested. Because of this the Defendants prepared another Plan calling for 19 lots and meeting the objections of the County. This Plan was accepted by the Plaintiff, submitted to the County and approved. With the acceptance

of this Plan by the Plaintiff, he prepared a Contract of Sale with the Scheelers calling for a purchase price of $27,500. Settlement was held about two months later, on or about 15 August 1966.

"Count 5 on the other hand alleges that the Scheelers employed the Defendants to prepare a survey of the tract to be sold with the acreage computed; that this was done for the benefit of the Plaintiff as the Real Estate Agent, and for possible purchasers."

He then held:

"The Court feels that the Plaintiff has not produced sufficient evidence to show a breach of duty owed by the Defendant to the Plaintiff to maintain a cause of action under Counts 4 and 8. Furthermore, the Plaintiff has not produced sufficient evidence to establish the cause of action for the Plaintiff as a third party beneficiary under the Contract between the Scheelers and the Defendants. In addition, there is no evidence that the Scheelers would have accepted less than $27,500. if the correct number of acres had been known. Mr. Scheeler's testimony indicated that there was no discussion of price on a per acre basis. His motivation for accepting Plaintiff's offer was that it gave him his $30,000. asking price minus commission. The number of acres in the tract was not a factor in his mind.

"Therefore, the Court will grant the Defendants' Motion for a Dismissal."

A motion to dismiss pursuant to Maryland Rule 535 was filed by each of the defendants at the end of the plaintiff's case. These motions were overruled. Each of the defendants then declined to offer any evidence and resubmitted what they called "a demurrer to evidence prayer". As Judge McWilliams put it for the Court in *Smith v.*

*State Roads Comm.,* 240 Md. 525, 214 A. 2d 792 (1965), relative to the motion to dismiss:

> "If he waits until the close of all of the evidence then the motion becomes a nugacity because all of the evidence is then before the trier of facts and the determination of its legal sufficiency becomes an inseparable and necessary part of his decision." *Id.* at 539-40.

Reighard assigns as error here the rulings of the trial judge (1) "holding [he] had no enforceable contractual rights as a result of a direct agreement between the parties"; (2) "sustaining the demurrer to [count two of] the Declaration"; (3) "sustaining the demurrer to [count three of] the Declaration"; and (4) "rejecting evidence of loss of profits". Since we conclude that the trial judge erred in holding that Reighard had not produced sufficient evidence to show a breach of duty owed by the defendant to him to maintain a cause of action, we have no need to consider the rulings upon demurrer relative to which Reighard complains.

I

The liability of a surveyor for his errors does not differ from that of professional people generally. He may be held responsible for such damages as are sustained as the result of his negligence and lack of skill. He is obliged to exercise that degree of care which a surveyor of ordinary skill and prudence would exercise under similar circumstances. See 50 Am. Jur. *Surveyors and Civil Engineers* § 3 (1944), and Clark, *Law of Surveying and Boundaries* §§ 11, 18 and 20 (3rd ed. Grimes 1959).

Reighard's testimony as to his direction to the surveyor relative to the size of lots is undisputed. The documentary evidence in the proceedings includes a plat with a June 3, 1966, date on it submitted by the surveyors with the legend on it, "A preliminary subdivision of the lands of Lane Reighard." This date was prior to the execution on June 21 of the contract between Reighard and the

Scheelers. An undated bill from Harford Survey Associates to Reighard in the amount of $385.75 read as follows:

"Stake lots, preparing preliminary, plot crosssection, computations, prints"

and was paid by Reighard on July 13, 1966. The plat filed as an exhibit with the June 3, 1966, date on it did not show lot lines. It did show contour lines. There was filed, however, a plat with a similar legend on it with lot lines showing a date of June 3, 1966, and then "Revised 3 Aug. 1966", that shows the "enclosed area" as "22.08 Ac. ±", with the total number of lots as 19. It is conceded that the original June 3 version of this plat showed 19 lots and was seen by Reighard prior to execution of the contract of sale. A plat prepared for the Scheelers with a March 21, 1966, date on it showed 20 lots and the "enclosed area" as "22.075 Ac. ±".[1]

The documentary evidence establishes a contract between Reighard and Downs. The trial judge seized upon the fact that there was no evidence that the Scheelers would have accepted less than $27,500.00. That is true. The other side of the coin, however, is that Reighard made his offer believing that lots could be made out of the tract proportionate to the acreage represented by Downs as being in the tract, and in accordance with his directions to Downs relative to subdivision. Certainly, a surveyor exercising ordinary skill and prudence under similiar circumstances should not invert the coördinates when computing acreage. In this case, the erroneously computed acreage exceeded 10% of the true acreage.

---

1. The parties stipulated, "[W]hen a surveyor states the area included within a given perimeter and extends that description to tenths or hundredths or thousandths and follows that designation with the symbols plus or minus, that the plus or minus indicates variations only in the last stated digit; so that in cases where it would be stated to the hundredths of an acre, the plus or minus implies that there will be a difference of hundredths of acres; and when it goes to thousandths of an acre, the plus or minus indicates variations of a thousandth of an acre or thereabouts."

## II

On the issue of damages Reighard relied upon his computations of loss of profits according to the following formula:

"Cost of land purchased
    (full price)                      $27,500.00
Excess amount offered         3,125.00

                                     $24,375.00
Cost of improvements          25,843.25 [2]

Total Investment               $50,218.25
Sold lots           $52,700.00
Still to sell         32,200.00 [3]   $84,900.00

Profit is                      $34,681.75
Profit per acre is:    $ 1,778.55
Investment per acre is: $ 2,575.30
Selling price per acre,
   assuming same lot
   values            $ 4,353.85
Profit percentage     40.85%
Return           169.06%"

From this Reighard says:

"The computations of per acre figures are all simple arithmatic ones although no testimony giving the products and quotients was actually introduced. On this basis the loss of profits is 2.5 x $1778.55 or $4463.75."

Reighard qualified as an expert and gave his opinion as to the fair market value of the remaining lots, from which the above formula is derived. The trial judge granted a

2. This figure is as it appears in Reighard's brief. The record shows $25,847.25.

3. This figure is as it appears in Reighard's brief. The sum of Reighard's testimony as to the fair market value of the remaining lots is $31,200.00.

34

motion to strike the testimony relative to lost profits, and
we believe correctly so.

Judge Horney in *M & R Builders v. Michael*, 215 Md.
340, 345-49, 138 A. 2d 350 (1958), reviewed the law rela-
tive to claims for "unrealized profits" and Judge Singley
quoted extensively from that opinion for the Court in
*Macke Co. v. Pizza of Gaithersburg*, 259 Md. 479, 488-89,
270 A. 2d 645 (1970). See also *Prescon Corp. v. Savoy
Constr. Co.*, 259 Md. 52, 267 A. 2d 222 (1970). The claim
here falls into the second category mentioned in *M & R
Builders*, the injured party being "a *buyer* of something
which he plans to *resell*" and the claim is therefore de-
nominated as one for "recovery of collateral profits".

11 Williston, *Law of Contracts* § 1346A (3rd ed. Jae-
ger 1968), entitled "How Are Prospective Profits Prop-
erly Proved?", states:

> "Various methods are used in proving prospec-
> tive profits. These methods are not mutually ex-
> clusive, but often one method is more feasible
> than others.
>
> \* \* \*
>
> "4. The evidence of experts if based on any-
> thing more than individual opinion or conjec-
> ture has also been admitted;
>
> 'The rule is that, while the law will not per-
> mit witnesses to speculate or conjecture as to
> possible or probable damages, still the best evi-
> dence of which the subject will admit is receiv-
> able, and this is often nothing better than the
> opinion of well-informed persons upon the sub-
> ject under investigation.' " *Id.* at 245 and 250.

The difficulty with the evidence here presented by Rei-
ghard is twofold. Reighard gave his opinion of the fair
market value of the remaining lots without giving any
basis for that opinion. This Court has said many times,
*e.g., Miller v. Abrahams*, 239 Md. 263, 273, 211 A. 2d 309
(1965); that "[A]n expert's opinion is of no greater pro-

bative value than the soundness of his reasons given therefor will warrant." More importantly, however, Reighard's computation of loss here is predicated upon the hypothesis that had he had in his possession the additional two and a half acres which he thought he was buying that this would have worked out to the same return per acre. The various plats submitted show an extensive easement for drainage and they show various attempts to work out streets for the subdivision. Therefore, it just does not follow as a matter of mathematics that the return would have been the same. Much of what Judge (later Chief Judge) McSherry said in *Lanahan v. Heaver,* 79 Md. 413, 29 A. 1036 (1894), in a claim for lost profits has application by way of analogy here:

> "Now, what proof is there on this subject in the record? Of the twenty-two houses actually built, but five have been sold, and four are held to secure advances, leaving thirteen unsold. Whether the five which were never built would have been sold had they been erected, within what time they would have been sold, and what prices they would have brought if sold, are questions to which nothing in the record furnishes an answer. That there was no demand for them seems to be reasonably certain from the fact that thirteen of those actually built remain unsold, and there is nothing to suggest that there existed any reason why these five in the bed of Barclay street would have sold any more readily than either of the thirteen yet undisposed of. Had they been constructed and built, there are no data from which, with any approximation to certainty, the time of their sale can be estimated; and if their sale had been deferred for a few years the accumulation of amounts paid in ground rents, taxes, and interest charges on money borrowed beyond the bonus for their erection, and other outlays might, and probably

would, have consumed every cent of profits which Heaver expected to realize on them. Then again, there is not a particle of evidence to show, and from the very nature of things there could not possibly have been any reliable evidence adduced to show, the price at which either of these five houses, had they been built, would have sold, assuming that they would have been sold at all; and there was no attempt made to estimate their probable market value. Without some such evidence it is simply impossible to form any judgment as to whether there would or would not have been profits arising out of the undertaking. In the absence of all evidence as to whether these five houses would ever have been sold; as to when they would have been sold, and as to what price they would have brought, any estimate of profits must necessarily be conjectural and speculative to the utmost degree; not because of the uncertainty as to the amount of the profits, but because of the very obvious uncertainty as to whether there would have been any profits at all. It is the latter uncertainty or contingency which precludes a recovery of profits alleged to have been lost." *Id.* at 422-23.

So, here, the proof is "conjectural and speculative". Instances have been known in which lots in subdivisions have gone unsold for many years. Despite the testimony of Reighard as to the then fair market value of the unsold lots, it does not necessarily follow that they would quickly be sold and the very questions raised by Judge McSherry relative to accumulations of taxes and interest charges would be applicable to those lots.

Since Reighard did establish liability, he is entitled to such damages as he in fact established. From what is printed in the record extract we are unable to determine precisely what damages were established. Accordingly, the case is remanded for a determination from the record

of Reighard's actual damages which, under our ruling here, will not include lost profits.

> *Judgment reversed as to liability; case remanded for determination of appellant's damages and entry of judgment therefor; judgment entered for appellant for costs on appeal and below.*